No. 10-50585

IN THE

**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

            v.

DILLON SHAREEF,
also known as NURALDIN SHAREEF KARIM,
also known as DILLON SHARIF,

     Defendant-Appellant.

_____

**GOVERNMENT'S ANSWERING BRIEF**

APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
_____

**ANDRÉ BIROTTE JR.**
**United States Attorney**

**ROBERT E. DUGDALE**
**Assistant United States Attorney**
**Chief, Criminal Division**

**ELLYN MARCUS LINDSAY**
**Assistant United States Attorney**
**Major Frauds Section**

  1100 United States Courthouse
  312 North Spring Street
  Los Angeles, California 90012
  Telephone: (213) 894-2041

**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iii

I.   ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT OF THE CASE . . . . . . . . . . . . . . . . 2

     A.   NATURE OF THE CASE, COURSE OF THE PROCEEDINGS,
          AND DISPOSITION IN THE DISTRICT COURT . . . . . . . 2

     B.   JURISDICTION, TIMELINESS, AND BAIL STATUS . . . . . 3

     C.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . 4

          1.   Offense Conduct . . . . . . . . . . . . . . . 4

          2.   Guilty Plea . . . . . . . . . . . . . . . . . 8

          3.   Sentencing . . . . . . . . . . . . . . . . . 9

               a.   Presentence report . . . . . . . . . . 9

               b.   Positions of the parties . . . . . . . 10

               c.   Sentencing hearing . . . . . . . . . . 16

III. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . 20

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 21

     A.   THE COURT DID NOT ERR IN DEFERRING THE ISSUANCE
          OF CREDITS FOR TIME SERVED PRIOR TO SENTENCING
          TO THE BUREAU OF PRISONS, WHICH IN FACT GAVE
          DEFENDANT THE REQUESTED CREDITS . . . . . . . . . 21

          1.   Standard of Review . . . . . . . . . . . . . 22

          2.   The Authority to Grant Pre-Sentence Credits
               Lies with the Bureau of Prisons . . . . . . 22

     B.   DEFENDANT WAS NOT ENTITLED TO A DOWNWARD
          ADJUSTMENT IN HIS GUIDELINE OFFENSE LEVEL FOR
          HIS WAIVER OF EXTRADITION WHERE THE GOVERNMENT'S
          OFFER TO MOVE FOR SUCH A DEPARTURE WAS DEPENDENT
          ON DEFENDANT'S ACCEPTANCE OF THE PLEA AGREEMENT . . 24

1.   Standard of Review . . . . . . . . . . . . .   24

2.   Because Defendant Rejected the Plea Agreement,
     the Government Was Not Bound by Any Offers
     Therein  . . . . . . . . . . . . . . . . . . .   25

C.   THE DISTRICT COURT DID NOT PLAINLY ERR IN
     CALCULATING THE GUIDELINE LOSS AMOUNT AND DID
     NOT ABUSE ITS DISCRETION BY CONSIDERING UNDER
     18 U.S.C. § 3553(A) DEFENDANT'S PRIOR
     TELEMARKETING FRAUD . . . . . . . . . . . . . .   28

     1.   Standard of Review . . . . . . . . . . . . .   28

     2.   The District Court Did Not Plainly Err in
          Calculating the Guideline Loss Amount  . . . .   29

     3.   To the Extent the Court Considered Defendant's
          Prior Fraud Under § 3553(a), It Did Not
          Abuse Its Discretion . . . . . . . . . . . .   31

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . .   32

STATEMENT OF RELATED CASES  . . . . . . . . . . . . . .   33

**TABLE OF AUTHORITIES**

**CASES:**                                                       **PAGE(S)**

Gall v. United States,
    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . 28

United States v. Bright,
    353 F.3d 1114 (9th Cir. 2004) . . . . . . . . . . . . 30

United States v. Carty,
    520 F.3d 984 (9th Cir. 2008) . . . . . . . . . . 28, 31

United States v. Clark,
    218 F.3d 1092 (9th Cir. 2000) . . . . . . . . . . 25, 26

United States v. Kimbrew,
    406 F.3d 1149 (9th Cir. 2005) . . . . . . . . . . . . 29

United States v Peters,
    470 F.3d 907 (9th Cir. 2006) . . . . . . . . . . . . 22

United States v. Streich,
    560 F.3d 926 (9th Cir. 2009) . . . . . . . . . . . . 30

United States v. Thornton,
    511 F.3d 1221 (9th Cir. 2008) . . . . . . . . . . . . 24

United States v. Wahid,
    614 F.3d 1009 (9th Cir. 2010) . . . . . . . . . . . . 29

United States v Wilson,
    503 U.S. 329 (1992) . . . . . . . . . . . . . . . 22, 23

White v. Martel,
    601 F.3d 882 (9th Cir. 2010) . . . . . . . . . . . . 23

**STATUTES:**

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 2326 . . . . . . . . . . . . . . . . . . . . . 3

**STATUTES:**                                                    **PAGE(S)**

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3585(b) . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . 3

**RULE:**

Fed. R. App. P. 4(b) . . . . . . . . . . . . . . . . . . . 3

**SENTENCING GUIDELINES:**

USSG § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . 12

USSG § 2F1.1 . . . . . . . . . . . . . . . . . . . . . . 12

USSG § 2F1.1(a) . . . . . . . . . . . . . . . . . . . . . 9

USSG § 2F1.1(b)(1)(K) . . . . . . . . . . . . . . . . . . 13

USSG § 2F1.1(b)(2)(K) . . . . . . . . . . . . . . . . . . 29

USSG § 2F1.1(b)(1)(O) . . . . . . . . . . . . . . . . . . 9

USSG § 2F1.1(b)(2)(M) . . . . . . . . . . . . . . . . . . 29

USSG § 3A1.1(b)(1) . . . . . . . . . . . . . . . . . . . 12

USSG § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . 10

USSG § 3E1.1 . . . . . . . . . . . . . . . . . . . . . . 10

USSG § 4A1.3 . . . . . . . . . . . . . . . . . . . . . . 18

USSG § 5K2.0 . . . . . . . . . . . . . . . . . . . 15, 25

No. 10-50585

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT


UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

          v.

DILLON SHAREEF,
also known as NURALDIN SHAREEF KARIM,
also known as DILLON SHARIF,

    Defendant-Appellant.

_____


**GOVERNMENT'S ANSWERING BRIEF**

**I**

**ISSUES PRESENTED**

A.   Whether the district court erred in deferring the issue
of pre-sentence incarceration time credits to the Bureau of
Prisons, which has already provided defendant with the credits he
seeks.

B.   Whether the district court clearly erred in finding
that the government did not breach any promise to recommend a
downward departure based on defendant not contesting his
extradition.

C.   Whether defendant waived any challenge to the guideline
loss amount, to which he expressly agreed at sentencing, or

alternatively whether the district court plainly erred in
calculating the guideline loss amount or abused its discretion by
considering defendant's prior fraud, which was not used to
calculate the guideline loss, in fashioning its sentence under 18
U.S.C. § 3553(a).

## II

### STATEMENT OF THE CASE

A.  NATURE OF THE CASE, COURSE OF THE PROCEEDINGS, AND
    DISPOSITION IN THE DISTRICT COURT

Defendant-appellant Dillon Shareef, also known as Nuraldin
Shareef Karim, also known as Dillon Sharif ("defendant") appeals
his sentence, following his plea of guilty before the Honorable
Dean D. Pregerson, United States District Judge.  Defendant
argues (1) that the court erred in deferring the application of
pre-sentence incarceration time credits to the Bureau of Prisons,
(2) that the government failed to recommend a 2-level downward
departure based on defendant not fighting extradition, and (3)
that the district court miscalculated the loss amount or abused
its discretion by considering his past history of telemarketing
fraud.

On March 3, 2005, defendant was charged in an indictment
with nine counts of mail fraud, aiding and abetting and causing
an act to be done, and the sentence enhancement for telemarketing
fraud against the elderly, in violation of 18 U.S.C. §§ 1341, 2,
and 2326, and thirteen counts of wire fraud, aiding and abetting

and causing an act to be done, and the sentence enhancement for telemarketing fraud against the elderly, in violation of 18 U.S.C. §§ 1343, 2, and 2326.  (CR 6; ER Exhibit 4.)[1]  On June 18, 2010, defendant pled guilty to counts 2, 3 and 4 of the indictment without a plea agreement.  (CR 41.)  On November 22, 2010, the district court sentenced defendant to 171 months of imprisonment, with three years of supervised release, and ordered him to pay restitution of $924,613 and a special assessment of $300.  (CR 58; 11/22/10 RT 48-51; ER 48-51.)

B.    JURISDICTION, TIMELINESS, AND BAIL STATUS

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.  The district court entered the judgment and commitment order on November 24, 2010.  (CR 59.)  Defendant filed a timely notice of appeal on December 1, 2010.  (CR 61.) See Fed. R. App. P. 4(b).  Defendant is currently in custody serving the 171-month term of incarceration imposed in this case.

---

[1]     "CR" refers to the Clerk's Record and is followed by the docket control number.  "AOB" refers to the Appellant's Opening Brief, and is followed by the page number.  The Government's Position Re: Sentencing Factors, Defendant's Position Re Sentencing, and Government's Response to Defendant's Position Re: Sentencing, which have been filed under seal by defendant, are referred to by their titles and followed by the page number.  "ER" refers to the Appellant's Excerpts of Record and is followed by volume number, item number, and page number. "GER" refers to the Government's Excerpts of Record and is followed by the page number.  "RT" refers to the Reporter's Transcript and is preceded by the date and followed by the page number.  "PSR" refers to the presentence report, and is followed by the applicable paragraph number.

C.   STATEMENT OF FACTS

1.   <u>Offense Conduct</u>

Defendant's charges and conviction arose from his running a scheme to defraud victims from approximately January 1999 through October 2001, although he had been engaging in this conduct since approximately 1996.  (PSR ¶¶ 2, 7; ER 1, 4, 1-18.)

There was no written plea agreement in this case.  However, the government recited a factual basis into the record at defendant's change of plea, and defendant agreed that it was correct.  (6/18/10 RT 16; GER 16.)  In pertinent part, the factual basis to which defendant agreed stated that beginning in 1999, defendant ran several companies (collectively referred to as "the fraudulent lottery companies") that were located in the Vancouver area of British Columbia, Canada.  (6/18/10 RT 13; GER 13.)  The fraudulent lottery companies were telemarketing companies that operated by having defendant and telemarketers working for him (at least five of whom were participants in the scheme to defraud) telephone mostly elderly victims in the United States and falsely and fraudulently inform them that they had won a large sum of money in a lottery or were competing with a small group of people to win a large sum.  (6/18/10 RT 13-14; GER 13-14.) Defendant and his telemarketers also told the victims that they had to send in money to the fraudulent telemarketing companies, which money represented taxes, customs fees, and similar costs. (6/18/10 RT 14; GER 14.)  Once a victim sent in

money, defendant and his telemarketers repeatedly called the victim and told the victim that he or she had won additional money in order to induce the victim to send more money to the fraudulent lottery companies. (6/18/10 RT 14; GER 14.)

In fact, as defendant then knew, there was no lottery connected to the fraudulent lottery companies, and defendant would use the victims' money for his own purposes and to run the fraudulent lottery companies. (6/18/10 RT 14-15; GER 14-15.) Through this scheme to defraud, the defendant victimized more than ten person over the age of 55 and caused a loss of approximately $1.8 million. (6/18/10 RT 15; GER 15.)

On July 13, 1998, the United States District Court for the Western District of Washington entered an order prohibiting defendant from engaging directly or indirectly in the sale of lottery tickets. Defendant's conduct in this case violated that order. (6/18/10 RT 15; GER 15.)

On October 22, 2001, defendant was arrested in Canada on charges in this case. The day after arrest, he was released on bond. He fled and was a fugitive until 2008, at which time he was arrested in the United Kingdom. (6/18/10 RT 16; GER 16.)

In the presentence report, the probation officer detailed defendant's long history of telemarketing fraud and flight from prosecution. Defendant began his telemarketing fraud at least as early as 1995. (PSR ¶ 8.) In 1998, the United States District Court for the Western District of Washington entered an order

against defendant prohibiting him from engaging in lottery sales to United States consumers. (PSR ¶ 7.) This judgment was the result of a scam defendant perpetrated from British Columbia, Canada, against 2,744 victims, who suffered a total loss of approximately $5 million. (PSR ¶ 7.) Defendant called senior citizens and falsely told them they had a one-in-six chance to win millions of dollars in a lottery, but they had to pay money for tickets, taxes on supposed winnings, and other expenses. (PSR ¶¶ 8, 9.)

After the judgment was entered against him in Washington, defendant fled Canada for Spain, where he continued his telemarketing fraud against elderly Americans and Canadians. (PSR ¶ 10.) Again, the solicitation was that if the victim sent defendant money, the victim would have an excellent chance to win a lottery. (PSR ¶ 10.) Victims who sent money were then recontacted and told they had actually won, but would have to pay taxes and other fees to collect. (PSR ¶ 10.) Authorities in Spain filed criminal charges against defendant and his girlfriend, Melissa Robinson. Defendant was arrested but released and fled Spain prior to trial. (PSR ¶ 10.)

By early 2000, defendant was back in British Columbia and started the scheme that was charged in the indictment. (PSR ¶¶ 11-18.) Defendant had at least six other telemarketers working for him. (PSR ¶ 13.) Defendant and these telemarketers would phone people in the United States and falsely tell them

they had won large amounts of money or that they had a very good chance to win money. (PSR ¶ 13.) In order to receive the winnings or to participate, they had to send money to one of defendant's companies. (PSR ¶ 13.) The telemarketers would repeatedly call those who had sent money and convince them to send more and more by falsely telling them they had won additional money but needed to send additional payments to receive it. (PSR ¶ 14.) Many of the victims were elderly. (PSR ¶ 14.) The loss to the approximately 43 victims was approximately $1.8 million. (PSR ¶ 14.) No victim ever received any kind of lottery winning from defendant or his companies. (PSR ¶ 18.)

On October 22, 2001, defendant was arrested in Canada based on a complaint filed in the Central District of California. (PSR ¶ 26.) On his person at the time were checks and money orders totaling almost $12,000 made payable to the names of his various lottery companies. One was from an elderly man in Indiana who had been told that he had won $2.7 million but needed to send a $5,900 administrative fee to obtain the winnings. (PSR ¶ 27.) Also on defendant's person were notes regarding contacts with victims, money received or to be received from victims, and a handwritten list with names, contact information, amounts, and commission information. (PSR ¶ 28.) A search of defendant's car revealed two additional payments from victims -- one in the amount of $35,200. (PSR ¶ 29.)

The day after defendant's arrest, he was released on bond. He failed to appear in court and was a fugitive until December 2008, when he was arrested on unrelated charges in the United Kingdom and a fingerprint analysis revealed the international warrant for his arrest. (PSR ¶ 31.)

When defendant was arrested in Canada in 2001, his assets were seized, and from these, $906,465 was distributed to some of defendant's victims, leaving a balance of $924,613. Of the 43 post-July 1998 victims who could be identified, 32 were over the age of 70. (PSR ¶ 32.) Many of the victims were deceased or could not be located. (PSR ¶ 32.)

2. <u>Guilty Plea</u>

Defendant pleaded guilty to counts two, three, and four without a written plea agreement. (6/18/10 RT 6; GER 6.) At defendant's change of plea hearing, the court questioned defendant as to whether he understood that the court would have to calculate the sentence pursuant to the guidelines and section 3553(a), and defendant stated that he did. (6/18/10 RT 10; GER 10.) The court then asked: "Has anyone made you any promises of leniency of a particular sentence of probation or made any other inducement to cause you to plead guilty?" (6/18/10 RT 10-11; GER 10-11.) Defendant replied, "No, Your Honor." (6/18/10 RT 11; GER 11.)

Following the court's colloquy with defendant, the court then questioned defense counsel regarding defendant's guilty

plea.  In this colloquy, the court asked defense counsel: "Other than discussing with your client how the Court must go about determining a sentence, have you given any indication to your client what sentence the Court would impose or convey to your client any promise of a particular sentence?"  (6/18/10 RT 18; GER 18.)  Defense counsel responded "No, Your Honor."  (6/18/10 RT 18; GER 18.)

      3.    <u>Sentencing</u>

           a.    <u>Presentence report</u>

The probation officer calculated defendant's offense level as 32 which, with a criminal history score of I, yields a range of 121 to 151 months.  (PSR ¶ 97.)  This was based on the November 1, 2000, guidelines.  (PSR ¶ 40.)

Specifically, the base offense level was six, pursuant to USSG § 2F1.1(a).  (PSR ¶ 44.)  The probation officer included defendant's pre-1998 conduct in calculating loss.  Thus, she combined the $5 million loss from that conduct with the $1.8 loss from the current conduct, for a total of $6.8 million.  This yielded an addition of 14 levels pursuant to USSG § 2F1.1(b)(1)(O).  (PSR ¶ 45.)  The probation officer also recommended enhancements for more than minimal planning, mass marketing, defendant's violation of a prior judicial order prohibiting him from engaging in the sale of lottery tickets or offerings, committing the scheme outside the United States, perpetrating the scheme against vulnerable victims, and

obstruction of justice.  (PSR ¶¶ 46-54.)  The probation officer

declined to recommend any levels off for acceptance of

responsibility, pursuant to USSG § 3E1.1, stating that although

defendant pleaded guilty and admitted the facts as recited by the

prosecutor, he "minimized and rationalized his involvement in the

offense" by telling the probation officer he never knew the

victims were elderly, did not make any false statements or

misrepresentations or false statements, and did not tell anyone

they had won a prize.  He would only admit that he asked people

for money and knew this was wrong.  (PSR ¶¶ 56-57.)

       b.   <u>Positions of the parties</u>

The government submitted exhibits and argued for an

additional four-level upward adjustment pursuant to USSG

§ 3B1.1(a) for being an organizer or leader of an offense

involving five or more participants.  (Government's Position Re:

Sentencing Factors 7-13.)  The government also recommended that

defendant receive the downward adjustment of three levels for

acceptance of responsibility because, although defendant

minimized his culpability to the probation officer, he did plead

guilty and admit that what he did was wrong.  (<u>Id.</u> at 3.)  Thus,

the government recommended that defendant receive the downward

adjustment of three levels for acceptance of responsibility.

(<u>Id.</u> at 3.)

With a resulting offense level of 33, a criminal history

score of I, the government recommended a sentence within the

resulting range of 135-168 months.  (<u>Id.</u> at 13.)  In making this
recommendation, the government emphasized the seriousness of the
offense, namely, that defendant personally took millions and
millions of dollars from thousands of victims, and when law
enforcement and the courts tried to stop him, he fled and started
up again in a new location.  (<u>Id.</u> at 13.)  The government
attached to its sentencing memorandum a victim impact statement
sent by a victim with the initials M.L, which demonstrated how
defendant personally convinced this victim -- who he knew was
disabled, elderly, and sickly -- to sell her house and give him
the money, and how she became virtually homeless, unable to pay
for her medical care, and wondering from where her next meal
would come.  She stated that defendant knew her life story --
that she was disabled and elderly.  Yet he still induced her to
send him money until all her savings were gone, and then induced
her to sell her home and send him the money.  Because of that,
she had to leave her home and has not been able to pay for proper
medical care or sometimes even for food.  He ruined her life.
(<u>Id.</u> at 14-15.)

     The government presented further evidence of defendant's
callous disregard for his victims.  When interviewed by the
government, defendant's one-time partner, Nanda Duraisami, said
that victim M.L. was defendant's "favorite" customer.  (<u>Id.</u> at
15.)  Duraisami said that defendant had customers who were
attached to him, and that he had a way of getting people to send

money just because he called.  Duraisami stated defendant would
brag about his large sales ($20,000, $30,000) and say to his
telemarketers "I've sold $20,000 to them, why can't you sell them
$10,000."  (Id. at 15-16.)  Defendant's mistress and cohort
Melissa Robinson recounted that defendant made comments about
customers such as how stupid, gullible, and easy they were.  (Id.
at 16.)

The government argued that the loss under-represented the
seriousness of the offense.  There is no guideline enhancement
that reflects the severe pain and suffering defendant inflicted
on his victims, most markedly the elderly, disabled woman who
defendant convinced to sell her home and who has been unable to
afford medical treatment and other necessities of life since.
USSG § 3A1.1(b)(1) provides for an upward adjustment of two
levels if the offense involves vulnerable victims.  However, this
guideline does not take into account the emotional, physical, and
particularly devastating financial harm defendant visited on his
victims.  In fact, USSG § 2F1.1, Commentary Note 11(c)
(November 1, 2000) (now reproduced in substance in § 2B1.1,
Commentary Note 19(A)(ii)) includes as a reason for upward
departure: "The offense caused reasonably foreseeable,
psychological or psychological harm or severe emotional trauma."
(Government's Position Re: Sentencing Factors 16.)

Moreover, defendant was using the victims' money to live a
luxurious lifestyle.  Melissa Robinson pointed out that defendant

"was always spending money very frivolously," such as giving her $5,000 for her birthday. (Id. at 16-17.) She said, "It was a whirlwind, a whirlwind of things, right, like there was always some kind of chaos and always some party and some clothes and some trip . . . ." (Id. at 17.) Duraisami reported that at one point, defendant was using cocaine and marijuana and was spending $500-$600 per day on prostitutes. (Id. at 17.)

In his sentencing position, defendant first disputed the probation officer's loss calculation. He argued that the pre-July 1998 loss should not be included in his guideline calculation because that case was settled civilly. (Defendant's Position Re Sentencing 6.) He claimed that the adjustment for loss should actually be 10 levels, for a loss between $500,000 and $800,000, pursuant to USSG § 2F1.1(b)(1)(K). (Id.) He also disputed the adjustments for mass marketing (id. at 7), violating a judicial order (id. at 7-8), and vulnerable victims (id. at 8-9) should not apply. He argued that the downward adjustment for acceptance of responsibility should apply. (Id. at 9-10.) Defendant further argued that he should have received credit for providing information to the government. (Id. at 10-11.) He argued that the offense level should be 15, with a criminal history score of I, and a range of 18-24 months. He argued that 18 months was the appropriate sentence. (Id. at 12-13.)

In the course of arguing against an obstruction of justice enhancement, defendant argued that the prosecutor had agreed with

his previous attorney that if defendant voluntarily agreed to return to the United States from the United Kingdom, the government would "take two levels off." (Id. at 9.)  He argued that "In reliance thereon," he "dismissed his court case in London, did not fight extradition and agreed to be brought to the United States."  (Id.)

The government responded that the probation officer appropriately included the $5 million in losses from defendant's prior telemarketing, as it constituted relevant conduct, and that the civil judgment entered against defendant did not preclude criminal prosecution.  (Government's Response to Defendant's Position re: Sentencing 4-5.)  The government also argued that the enhancements for mass marketing, violation of a judicial order, vulnerable victims, obstruction of justice were properly applied by the probation officer.  (Id. at 11-13.)  The government also noted that federal inmates are given credit for time spent in custody prior to sentencing, including time spent in a foreign prison, so long as the time is not credited against another sentence.  (Id. at 3-4, 15.)

Regarding defendant's argument against the obstruction of justice enhancement, the government noted that defendant was mixing apples and oranges.  The enhancement applied because defendant fled from prosecution, which defendant admits that he did.  (Id. at 11.)  What defendant wanted was specific performance of an alleged promise made by the government to move

for a downward adjustment of two levels pursuant to USSG § 5K2.0 for defendant's waiver of extradition.  (<u>Id.</u> at 11-12.)  However, the government argued, this offer was specifically conditioned on defendant's entering a written plea agreement.  The government noted that it had originally made the offer when defendant was still incarcerated in the United Kingdom and was still fighting extradition.  (<u>Id.</u> at 12.)  That agreement was never accepted.  In negotiating with defendant's current attorney, the government sent another plea agreement with an e-mail stating:

> As we discussed, I am sending you a proposed plea agreement that provides two points off for your client's consent to extradition.  As I told you, the offer to take those points off was made last August, and was intended to apply only if your client accepted the agreement at that time, which he obviously did not.  In fact, he has delayed this case repeatedly, leading to the necessity to depose witnesses who are extremely elderly.
>
> In the interests of quickly resolving this case, however, I am willing to extend the offer with the two points off for agreement to extradition, but only if it is accepted immediately.  Thus, this offer will expire if the plea is not entered before the court on or before June 18, 2010.

(<u>Id.</u>)

Defendant rejected the plea agreement, and he pled guilty without a plea agreement on June 18, 2010.  (<u>Id.</u>)  The government noted that although it is its practice to recommend a downward departure for defendants who have waived extradition, this is only done in the context of a plea agreement that saves the government time and effort in preparing for sentencing and

litigating any appeal.  (Id. at 12-13.)  Thus, defendant was not entitled to the benefit of a bargain he rejected.

### c. Sentencing hearing

At defendant's sentencing hearing, the court heard arguments from the parties regarding the disputed enhancements.  The court ruled: 1) that it would apply a three-level downward adjustment for acceptance of responsibility (11/22/10 RT 6; ER 6); and 2) that the following upward adjustments would apply: mass marketing (11/22/10 RT 10; ER 10); violation of a prior judicial order (11/22/10 RT 14, ER 14); vulnerable victims (11/22/10 RT 16; ER 16), and role as an organizer and leader of an "otherwise extensive" offense (11/22/10 RT 34; ER 34.)

Defendant argued that there was an agreement between the government and defendant that if he pled guilty, he would receive two levels off in addition to the downward adjustment for acceptance of responsibility because he waived extradition from the United Kingdom.  (11/22/10 RT 17-19; ER 2, 10, 17-19.)  The government responded that it was clear from counsel's correspondence that the government was agreeing to the downward adjustment as part of the written plea agreement, which defendant rejected.  (11/22/10 RT 19; ER 2, 10, 19.)  The only agreement between the parties at the time of the plea was that if defendant pled guilty to three counts of the indictment, the government would move to dismiss the remaining counts, and if defendant accepted responsibility, the government would move for that

downward adjustment.  (11/22/10 RT 19-20; ER 2, 10, 19-20.)  The court found that the government's offer to recommend the downward adjustment was contained in a plea agreement that also called on defendant to agree to numerous guidelines calculations, and since defendant did not enter that plea agreement, there was no contract to enforce.  (11/22/10 RT 24; ER 2, 10, 24.)

Defendant argued that he should receive credits against his sentence for time he served in the United Kingdom prior to his extradition, and time he served in the United States prior to his sentencing.  (11/22/10 RT 25-26; ER 2, 10, 25-26.)  The court noted that applying credits was done by the Bureau of Prisons.  (11/22/10 RT 25; ER 2, 10, 25.)  The court offered to put language in the judgment and commitment order to the effect that "it appears to the Court that the defendant likely qualifies for all of the time that he was incarcerated in a foreign jurisdiction, except perhaps a few days," "in addition to the time served in US custody."  (11/22/10 RT 26; ER 2, 10, 26.)  Counsel did not respond to the court's question whether that would be acceptable.  (11/22/10 RT 27; ER 2, 10, 27.)

As to loss, the court indicated that it would not count the pre-July 1988 loss of $5 million.  (11/22/10 RT 27-30; ER 2, 10, 27-30.)  The court then asked defendant whether he would dispute a loss of $1.8 million, which was the loss figure attributable to the offense and conviction calculated in the presentence report.  (11/22/10 RE 31; ER 2, 10, 31.)  Defense counsel responded:

"We're not disputing that, no, no."  (Id.)  The government stated
that it too  would accept a loss figure of $1.8 million.
(11/22/10 RT 32; ER 2, 10, 32.)

Regarding the 18 U.S.C. § 3553(a) factors, defendant argued
that he had a difficult background in coming from Iraq during the
Saddam Hussein years, his father and brother were shot to death
by soldiers, and he was constantly fearful of not having enough
to eat.  (11/22/10 RT 34-36; ER 2, 10, 34-36.)  He argued that
his continuing fraud came from a compulsion to make money to help
his family.  (11/22/10 RT 36; ER 2, 10, 36.)  He also argued that
he was in physical pain.  (11/22/10 RT 36; ER 2, 10, 36.)  He
further discussed some other defendants who had been accused of
large-scale stock fraud but who received very light sentences.
(11/22/10 RT 36-37; ER 2, 10, 36-37.)

The government argued that in light of the fact that the
court was not going to count the pre-July 1998 conduct that
resulted in the Washington State Attorney General judgment
against defendant, such conduct could form the basis for an
upward adjustment in defendant's criminal history score pursuant
to USSG § 4A1.3.  (11/22/10 RT 38; ER 2, 10, 38.)

The government argued that an upward adjustment was
appropriate both because of the prior civil adjudication and
because defendant was pending trial on the Spanish charges when
he fled and started the fraudulent enterprise that was the
subject of the charges to which he pled.  (11/22/10 RT 38; ER 2,

10, 38.)  Taking these two facts into consideration would have

yielded a criminal history score of III, which, with an offense

level of 31, would have resulted in a range of 135 to 168 months.

(11/22/10 RT 39; ER 2, 10, 39.)  Given the egregious nature of

defendant's conduct, the government requested a sentence at the

high end of that range. (11/22/10 RT 40-43; ER 2, 10, 40-43.)

The court sentenced defendant to 171 months, which was based

on an offense level of 31, a criminal history score of I, a range

of 108-135 months, and an upward variance of 36 months from the

high end.  The court stated that defendant's fraud was one of the

most aggravated cases it had ever seen, and it explained the

basis for its above-guidelines sentence:

> I think that this is one of the most aggravated
> cases that I've ever seen.
>
> Mr. Shareef was essentially playing hopscotch around
> the globe with this lottery scheme running from country to
> country, violating various orders He seems to have just had
> no off switch at all.  And there are some statements -- at
> least a statement in the presentence report where he
> essentially, you know, urges other people to -- to take
> advantage of other people He chides them into doing that.  I
> just see nothing that indicates that -- looking at the
> 3553(a) factors, that the most important one is not to
> protect the public from further crimes of the defendant.[2]
>
> I think all of the other mitigating factors I've
> considered as well, but I think that is the one that is
> simply paramount, and I agree with [the prosecutor] that
> this is probably the most aggravated -- you know,
> international lottery fraud case that I've ver seen.  And

---

[2]     In context, it is clear that the district court meant
to say "looking at the 3553(a) factors, that the most important
one is to protect the public from further crimes of the
defendant."

I've never seen one with such level of disdain for the
justice system in various countries.  So it just -- it tops
the -- my experience in that regard

        So given that, I feel that a 36-month upward departure
is appropriate.  And I think the high end is appropriate as
well.  I just do not believe Mr. Shareef is capable of -- of
making an honest living because I haven't seen anything
other than taking advantage of every opportunity and every
situation that he could in order to continue with the
scheme.

(11/22/10 RT 47-48; ER 2, 10, 47-48.)

### III

### SUMMARY OF ARGUMENT

Defendant argues that (1) the district court failed to
recommend to the Bureau of Prisons that it credit defendant's
sentence for time served in the United Kingdom and in federal
custody before his sentencing, (2) the government breached an
alleged promise to recommend a downward departure for defendant's
acquiescence in his extradition, and (3) the district court
improperly calculated the guideline loss amount or relied on
fraudulent conduct not included in the guideline calculation to
vary upward from the guideline range.  All of defendant's
arguments are meritless.

First, the Supreme Court has held that the Attorney General
(through his designee, the Bureau of Prisons), not the district
court, has the responsibility to award credits for time served
before sentence is imposed, and, in fact, the Bureau of Prisons
has awarded defendant the credits he seeks.

Second, the district court did not clearly err when it found that the parties had no agreement that the government would recommend a downward departure based on defendant not fighting his extradition.  Although the government offered to recommend such a departure as part of a plea agreement, defendant rejected the plea agreement and pleaded guilty without any agreement.

Third, defendant expressly agreed at the sentencing hearing to the loss amount the district court used to calculate the guideline range.  Thus, defendant has waived any challenge to the loss calculation, and, in any event, under settled law the court did not plainly err by not deducting from the loss amount money defendant paid in civil settlements.  To the extent defendant is challenging the district court's consideration, under 18 U.S.C. § 3553(a), of defendant's prior fraud, which the court did not include in the guideline loss calculation, a district court plainly may consider prior fraudulent conduct in crafting a sentence.  The district court did not abuse its discretion here when it sentenced defendant to 171 months for a fraud that the court described as one of the most aggravated cases it had seen.

**IV**

**ARGUMENT**

A.   THE COURT DID NOT ERR IN DEFERRING THE ISSUANCE OF CREDITS
     FOR TIME SERVED PRIOR TO SENTENCING TO THE BUREAU OF
     PRISONS, WHICH IN FACT GAVE DEFENDANT THE REQUESTED CREDITS

Defendant argues that the district court erred in deferring to the Bureau of Prisons the issue of credits for time he served

21

in the United Kingdom, while awaiting extradition, and in the United States prior to his sentencing.  (AOB 8-9.)  However, the award of such credits is the responsibility of the Bureau of Prisons.  Moreover, in this case, the Bureau of Prisons has awarded defendant the requested credits.

1.    Standard of Review

This Court reviews de novo the district court's ability to award prison credit.  United States v Peters, 470 F.3d 907, 908-09 (9th Cir. 2006).

2.    The Authority to Grant Pre-Sentence Credits Lies with the Bureau of Prisons

Pre-sentence credit is determined pursuant to 18 U.S.C. § 3585(b), which provides:

> A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences –
>
> (1) as a result of the offense for which the sentence was imposed . . .

that has not been credited against another sentence. These credits, the Supreme Court has held, are awarded by the Attorney General after sentence is imposed.  United States v Wilson, 503 U.S. 329, 334-35 (1992).  The district court has no authority to award credits at sentencing itself.  Peters, 470 F.3d at 909 ("[D]istrict courts lack authority at sentencing to give credit for time served.")

In this case, the district court correctly recognized that the authority to calculate these credits lies with the Bureau of

Prisons.  (11/22/10 RT 25; ER 2, 10, 25.)  The parties and the

court agreed that the court would place a recommendation that

defendant receive credit for the time he served in the United

Kingdom on the extradition in this matter and the time he spent

in the United States prior to sentencing.  (11/22/10 RT 26; ER 2,

10, 26.)

Defendant argues that the district court erred because it

failed to place this recommendation for credit in the judgment

and commitment order.  (AOB 7, 8-9; ER 1, 2, 1-5.)  However,

defendant has suffered no prejudice.  Not only would such a

recommendation not alter the statutory regime that vests the

Attorney General with authority to calculate credits, Wilson, 503

U.S. at 335, the Bureau of Prisons has given him the requested

extra spare credit.  Bureau of Prisons' records reflect that

defendant was given credit for 722 days of incarceration served

prior to his sentence: one day for his arrest in Canada in 2001,

and then from December 2, 2008, through November 21, 2010, the

time from his arrest in the United Kingdom to the sentencing in

the case.  (See Bureau of Prisons credit computation for

defendant, attached to the Government's Motion for Judicial

Notice filed concurrently with this brief).[3]  Accordingly,

_____

[3]    Although the document cited, a Bureau of Prisons credit
computation for defendant, is not included in the record, this
Court may take judicial notice of matters not included in the
record if they "capable of accurate and ready determination by
resort to sources whose accuracy cannot reasonably be
questioned."  Federal Rule of Evidence 201(b); White v. Martel,

regardless whether the district court should have included a recommendation in its judgment and commitment order (and it had no obligation to do so), defendant's claim regarding his pre-sentence credit is moot, as he has in fact received the requested credit.

B.   DEFENDANT WAS NOT ENTITLED TO A DOWNWARD ADJUSTMENT IN HIS GUIDELINE OFFENSE LEVEL FOR HIS WAIVER OF EXTRADITION WHERE THE GOVERNMENT'S OFFER TO MOVE FOR SUCH A DEPARTURE WAS DEPENDENT ON DEFENDANT'S ACCEPTANCE OF THE PLEA AGREEMENT

Defendant argues that the district court erred in failing to award him a downward adjustment in his sentence for waiving extradition from the United Kingdom.  (AOB 8-9.)  He argues that the government had promised to move for such a departure if he pled guilty.  (AOB 8-9.)  However, the government's offer to move for such an adjustment was conditioned on defendant's acceptance of the plea agreement.  Because defendant rejected the plea agreement, the government was not bound to move for a downward adjustment for defendant's voluntary consent to extradition.

1.   Standard of Review

This Court reviews the district court's interpretation and construction of a plea agreement, as well as factual findings

---

601 F.3d 882, 885 (9th Cir. 2010) (taking judicial notice of state court records, state bar records, and a docket sheet); United States v. Thornton, 511 F3d 1221, 1229 n.5 (9th Cir. 2008) (taking judicial notice of a Bureau of Prisons policy statement). Moreover, as documented in the government's concurrently filed Government's Unopposed Motion for Judicial Notice, defendant does not object to this Court's consideration of the Bureau of Prisons sentence computation.

regarding the terms of the plea agreement, for clear error.

United States v. Clark, 218 F.3d 1092, 1095 (9th Cir. 2000).  The

district court's determination whether the government breached

the plea agreement is reviewed de novo, as is whether language in

a plea agreement is ambiguous.  Id.

    2.    Because Defendant Rejected the Plea Agreement, the
          Government Was Not Bound by Any Offers Therein

Defendant claims that the government promised him that if he

voluntarily came to the United States from the United Kingdom

rather than fighting extradition, and agreed to enter a plea in a

timely fashion, the government would move for a downward

departure of two offense levels.  (AOB 4.)  The district court

found that the parties never had such an agreement.  This was not

clear error.

The government informed defendant that if he waived

extradition and entered a plea agreement, the government would

recommend such a departure.  In an e-mail to defendant's first

attorney, Donald M. Re, with whom the government was negotiating

while defendant was in the United Kingdom, the government set

forth a proposed set of guidelines calculations.  The government

added "If [defendant] enters this plea, I would also be willing

to recommend a two-level downward departure pursuant to USSG

§ 5K2.0 for consenting to extradition."  (Government's Response

to Defendant's Position Re: Sentencing 12.)  Defendant did not

enter into any agreement at that time.  (Id.)  When defendant

arrived in the United States, the government negotiated with
defendant's second attorney, and then with defendant's third and
current attorney, Michael Mayock.  In negotiations with Mr.
Mayock, the prosecutor sent an e-mail, attached to which was a
full written plea agreement.  The e-mail stated as follows:

> As we discussed, I am sending you a proposed plea agreement
> that provides two points off for your client's consent to
> extradition.  As I told you, the offer to take those points
> off was made last August, and was intended to apply only if
> your client accepted the agreement at that time, which he
> obviously did not.  In fact, he has delayed this case
> repeatedly, leading to the necessity to depose witnesses who
> are extremely elderly.
>
> In the interests of quickly resolving this case, however, I
> am willing to extend the offer with the two points off for
> agreement to extradition, but only if it is accepted
> immediately.  Thus, this offer will expire if the plea is
> not entered before the court on or before June 18, 2010.

(Id.)

As defendant concedes, he rejected this plea agreement, and
pled guilty without a plea agreement on June 18, 2010.  (AOB 5.)
Defendant nevertheless claims that even though he rejected the
plea agreement, he believed that since he pled guilty on June 18,
2010, he was entitled to the two point downward adjustment.  (AOB
6.)

This Court's "fundamental rule" is that "plea agreements are
contractual in nature and are measured by contract law
standards."  Clark, 218 F.3d at 1095 (citations and quotations
omitted).  "If the terms of the plea agreement on their face have
a clear and unambiguous meaning, then this court will not look to

26

extrinsic evidence to determine their meaning." Id. As the
district court found, the government's offer to recommend the
downward adjustment was contained in a plea agreement that also
contained defendant's agreement to numerous guidelines
calculations, and since defendant did not enter that plea
agreement, there was no contract to enforce. (11/22/10 RT 24; ER
2, 10, 24.)

Far from being clearly erroneous, this finding is the only
reasonable interpretation of the record: defendant simply never
accepted the government's offer to plead guilty pursuant to the
agreement. That there was no agreement between the parties was
made explicitly clear when defendant, under oath, affirmed to the
court that there were no "promises of leniency of a particular
sentence of probation or . . any other inducement" to cause him
to plead guilty. (6/18/10 RT 10-11; GER 10-11.) Defendant
raises no facts, extrinsic or otherwise, that would contradict
the district court's findings. Thus, his argument must fail.

To the extent defendant claims that fairness dictates that
he should have received time off for consenting to be extradited,
such an argument was made and rejected by the district court.
The district court clearly heard and considered defendant's
argument regarding his consent to removal from the United
Kingdom, and also clearly considered the factors of 18 U.S.C.
§ 3553(a). The court reasonably found that the aggravating
factors in this case, including the egregious nature of

defendant's conduct and his complete disregard for the legal system that tried to stop him, greatly outweighed any mitigation. (11/22/10 RT 47-48; ER 2, 10, 47-48.)

C. THE DISTRICT COURT DID NOT PLAINLY ERR IN CALCULATING THE GUIDELINE LOSS AMOUNT AND DID NOT ABUSE ITS DISCRETION BY CONSIDERING UNDER 18 U.S.C. § 3553(A) DEFENDANT'S PRIOR TELEMARKETING FRAUD

Defendant contests the loss calculation, arguing (AOB 10-11) that it was improper to include a loss of approximately $5 million from an earlier telemarketing fraud. Defendant also appears to argue (AOB 10) that the district court should not have considered the prior fraud as part of the § 3553(a) analysis. Defendant is wrong on both counts. First, the district court did not include this $5 million on the guideline loss calculation, and defendant, in fact, agreed to the $1.8 million loss figure in district court. Second, the district court was entitled to consider defendant's prior conduct as part of its § 3553(a) analysis.

1. Standard of Review

This Court reviews sentencing decisions for abuse of discretion. United States v. Carty, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citing Gall v. United States, 552 U.S. 38, 51 (2007.) "[O]nly a procedurally erroneous or substantively unreasonable sentence will be set aside." Id. In reviewing the district court's Sentencing Guidelines determination, this Court reviews the interpretation of the Guidelines de novo, the

application of the Guidelines to the facts for abuse of discretion, and factual findings for clear error.  <u>United States v. Kimbrew</u>, 406 F.3d 1149, 1151 (9th Cir. 2005.)

Where defendant fails to object to an alleged Sentencing Guidelines calculation error at sentencing, this Court reviews for plain error.  <u>United States v. Wahid</u>, 614 F.3d 1009, 1013 (9th Cir. 2010)

> 2. <u>The District Court Did Not Plainly Err in Calculating the Guideline Loss Amount</u>

Defendant first argues that the probation officer erred in this case by including in the calculation of loss approximately $5 million from defendant's prior fraudulent telemarketing activity.  (AOB 10-11.)  However, the district court determined that it would not consider this amount in its loss calculation, thereby determining that the loss was $1.8 million.  (11/22/10 RT 27-30; ER 2, 10, 27-30.)  Both the government and defense counsel agreed that this was the appropriate figure.  (11/22/10 RT 27, 31, 32; ER 2, 10, 27, 31, 32.)  This resulted in an upward adjustment of 12 levels for loss, pursuant to USSG § 2F1.1(b)(2)(M).

Regardless of his agreement that $1.8 million was the proper loss figure, defendant now asserts that the proper amount of loss should have been between $500,000 and $800,000, resulting in a ten-level upward adjustment pursuant to USSG § 2F1.1(b)(2)(K).  (AOB 10.)  To begin with, defendant waived his right to challenge

the loss calculation by expressly agreeing to the loss calculation at the sentencing hearing. E.g., United States v. Streich, 560 F.3d 926, 930 n.1 (9th Cir. 2009) (defendant waives claim when he intentionally relinquishes or abandons a known right).

Even assuming, however, that defendant may now challenge the loss calculation, the court did not plainly err in using $1.8 million as the loss amount. Defendant argues that $815,000 paid in a civil judgment in 1998 should have been subtracted, as should have been $170,000 paid to the Federal Trade Commission. (AOB 10.) He also appears to argue that $1.8 million of frozen and seized assets from Canada should have been subtracted. (AOB 10.)

First, it would have been an error to provide any credit for a settlement defendant reached for his pre-1998 conduct, as the loss calculation did not include this conduct. Second, the order in the 1998 case specifically provided: "Nothing in this Judgment shall be construed as to limit or bar any other entity or other consumer in the pursuit of other available remedies against Defendants." (Government's Response to Defendant's Position Re: Sentencing 4.) Third, and most important, no credit should be given to defendant for any civil settlements. Simply because a defendant pays money back to victims after the crime is detected does not reduce the amount of loss the victims in fact suffered. United States v. Bright, 353 F.3d 1114, 1118 (9th Cir. 2004).

More specifically, a defendant is not entitled to have the loss amount in his case lowered by the amount of money forfeited in a related civil matter.  Id. at 1119.[4]  Thus, the district court did not err, let alone plainly err, in calculating the loss.

3.    To the Extent the Court Considered Defendant's Prior Fraud Under § 3553(a), It Did Not Abuse Its Discretion

Defendant appears to argue that the district court improperly considered the $5 million in loss attributable to defendant's earlier fraud when it varied upward from the guideline range under the § 3553(a) factors.  The district court did not abuse its discretion.

First, a district court has wide authority to consider under § 3553(a)(1) not only the nature and circumstances of the offense, but also the history and characteristics of the defendant.  Regardless whether the prior fraud was relevant conduct to the offense of conviction, it was plainly probative of defendant's history and characteristics.  See, e.g., Carty, 520 F.3d at 991 (sentencing court must consider history and characteristics of defendant).  Moreover, the district court did not base its 36-month upward variance simply on the loss caused by the prior fraud.  Rather, the court explained that defendant's case was "one of the most aggravated cases that I've seen," that defendant was "essentially playing hopscotch around the globe

_____

    [4]    Defendant was given credit for the sums already paid to victims in this case in the determination of restitution.  (PSR ¶ 32.)

with this lottery scheme running from country to country, violating various orders," and that the court had "never seen [an international lottery fraud] with such level of disdain for the justice system in various countries." (RT 11/22/10: 47-48; ER 2, 10, 47-48.)  Defendant does not (nor could he credibly) challenge the overall reasonableness of his sentence.  To the extent the district court considered defendant's history of brazenly committing fraud in fashioning its sentence, the court did not abuse its discretion.

## IV

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.

Dated:    August 26, 2011

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

  /S/ Ellyn Marcus Lindsay
ELLYN MARCUS LINDSAY
Assistant United States Attorney
Major Frauds Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the government states that it is aware of no related case on appeal.

**Form 6.**    **Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)
because:

☒ this brief contains <u>7,471</u> words, excluding the parts of the brief exempted
by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains_____ lines of text,
excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)
and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☐ this brief has been prepared in a proportionally spaced typeface using *(state name
and version of word processing program)* _____
*(state font size and name of type style)* _____ *, or*

☒ this brief has been prepared in a monospaced spaced typeface using *(state name
and version of word processing program)* WordPerfect version 14
with *(state number of characters per inch and name of type style)*
10 characters per inch Courier New font                                    .

Signature | /s/ Ellyn Marcus Lindsay

Attorney for | United States

Date | Aug 26, 2011

| 9th Circuit Case Number(s) | 10-50585 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | Aug 26, 2011 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Tom Tanaka |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) |  | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |  |